IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MONTE DIAMOND GAINES, ) | |
| ) | |
| ) | |
| Petitioner, ) | |
| v. ) | Case No. CIV-12-83-HE |
| ) | |
| JUSTIN JONES, Director, ) | |
| Respondent. ) | |

# REPORT AND RECOMMENDATION

Petitioner Monte Diamond Gaines, a state prisoner appearing *pro se*, has filed a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254, ECF No. 1, and a Brief in Support of Application for Habeas Corpus, ECF No. 3, (Petitioner's Brief) challenging the constitutionality of his state court conviction. Respondent has filed a Response, ECF No. 14, (Response). For the reasons set forth below, it is recommended that the Petition be **DENIED**.

## I. Background and Relevant Case History

Petitioner seeks habeas relief based on alleged constitutional errors during his trial for first degree murder held on February 16-19, 2010. Petitioner was convicted of this crime after a jury trial in the District Court of Comanche County, State of Oklahoma, in Case No. CF-2009-172, and was sentenced to life imprisonment. Unless otherwise noted, the following account of relevant facts and testimony is taken from the trial transcript (TR. ___).

The fatal shooting of Emmett A. Futrell, for which Petitioner was convicted, arose from an encounter at a convenience store on the south side of Lawton, Oklahoma.

Petitioner, a member of a gang associated with the "Bloods," (TR. 431, 442), had gone to the convenience store around 3:00 p.m. to buy two cigars (TR. 430). There, he was taunted by two members of a gang associated with the "Crips," Futrell, and Justin Timms (TR. 257-258). Petitioner testified that Futrell initiated the contact by saying, "What's up, cuz." Petitioner replied, "I'm not your cuz" (TR. 430-431). Petitioner further testified that Timms continued to taunt him by alluding to the fact that their gang "burned" rival gang members who found themselves on the south side of Lawton (TR. 431). Petitioner returned to his residence, an apartment approximately one block from the convenience store. Petitioner lived in the apartment with his girlfriend, Sharon Denise Hallman (TR. 332-360). Once home, Petitioner sat at the computer for a time. Wishing to go outside to smoke, Petitioner found Hallman's gun and put it in the waist of his shorts, concealed by the shirt he was wearing. Petitioner testified that he took the gun with him because he was uneasy over the previous confrontation. He testified that he had interpreted Timms' remarks as "life threatening threats" (TR. 432-433).

Before the incident at the convenience store, Futrell had picked up Timms around noon, and the two had driven to the Brockland Apartments where Futrell's girlfriend resided. Futrell's girlfriend was working, but a third companion, Benny Burrell, was at the apartment. The three began drinking gin (TR. 260-261). Around 1:00 p.m., Futrell and Timms picked up Futrell's girlfriend, took her to lunch, and then took her back to work. The two then drove to the convenience store to meet Timms' mother (TR. 260-262). Timms was talking to his mother when he heard Futrell saying something to Petitioner. Timms

testified that Petitioner indicated his gang affiliation by "throwing a gang sign." Timms joined in the taunting until his mother told him to "chill." At that point, Futrell and Timms drove back to the Brockland Apartments followed by Timms' mother (TR. 262-266). After Timms' mother left, the three continued to drink (TR. 266).

Ultimately, Futrell, Timms, and Burrrell left the Brockland Apartments and saw an unidentified male at the apartment complex where Petitioner lived. They walked down the street a block or two to the opposite end of the apartment complex where Petitioner resided. They saw Petitioner at the other end of the apartment complex smoking outside in the breezeway of the apartment building. (TR. 262, 268, 332, 335). According to Timms, Futrell and Petitioner had a short conversation during which Petitioner identified himself (TR. 275). Timms testified that Petitioner pulled the gun out of the waist of his shorts, prompting the three adversaries to run. When the gunshots ceased, Timms returned to the scene and saw Futrell lying on the ground. Petitioner was gone (TR. 276-279).

Petitioner testified that Futrell, Burrell and Timms confronted him outside his apartment and formed a semicircle in front of him with Futrell in the center, Timms on his left, and Burrell on his right. Using the vernacular language of gangs, Futrell asked Petitioner what his problem was, and Petitioner stated he did not have a problem. At that point, Timms began threatening to "break [Petitioner's] face." Then, according to Petitioner, Burrell said, "Hit him with the burner." Petitioner interpreted "burner" to be a firearm. At that point, Petitioner testified that he thought Timms was reaching for a gun. Petitioner stated that he feared for his life, took out the gun from under his shirt, and

3

began shooting, though he was not shooting at any particular target (434-438). After the shooting, Petitioner returned to Hallman's apartment. He did not know until later that he had shot and killed Futrell.

When Hallman returned to the apartment, she told Petitioner about the shooting and the dead man lying on the grass outside the apartment building. She told Petitioner that she did not want to stay in the apartment that night because of the shooting. The two decided to go to Anadarko where they stayed all night. On the way, Petitioner finally told Hallman that he had been involved in the shooting. The two returned to Lawton the next day (TR. 340-344).

Petitioner was arrested on April 17, 2009. He was questioned by two detectives of the Lawton Police Department. The interrogation was recorded and depicts Detective Miller reading each line of the Miranda warnings to Petitioner who initialed each line indicating that he understood that sentence. He then signed the document waiving his right to remain silent. He did not request an attorney. Thereafter, Petitioner made a statement substantially the same as his testimony at trial. The video recording was played at trial and introduced into evidence as Exhibit 27 (TR. 408-411).

Petitioner appealed his convictions to the Oklahoma Court of Criminal Appeals (OCCA) raising the following issues:

1. The video recording of Petitioner's statement to the police was obtained involuntarily in violation of his Fifth and Fourteenth Amendment rights;

2. The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by giving confusing and contradictory jury instructions regarding the circumstances under which the jury could consider finding Petitioner guilty of the lesser included offense of first degree manslaughter;

3. The trial court violated Petitioner's First and Fourteenth Amendment rights by allowing introduction of prejudicial and irrelevant expert witness testimony about the customs and culture of street gangs;

4. The trial court committed fundamental error by improperly including additional instructions on the issue of the identity of the initial aggressor and related issues;

5. The introduction of irrelevant and highly prejudicial photographs deprived Petitioner of a fair trial;

6. Petitioner was denied a fair trial when the prosecutor was allowed to argue facts not in evidence during closing arguments;

7. Petitioner was deprived of his right to effective assistance of counsel in that trial counsel failed to object to improperly admitted evidence, erroneous jury instructions, and prosecutorial arguments; and

8. Cumulative error deprived Petitioner of a fair trial.

The OCCA affirmed Petitioner's convictions on March 17, 2011, ECF 14-3 (OCCA Opinion).

In this action, Petitioner raises the same eight grounds for relief that he presented in his appeal to the OCCA.

## II. <u>Standard of Review</u>

Under the standards set forth in the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court may grant Petitioner habeas relief only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Judicial review is directed to the result of the state

appellate court's decision, not its reasoning. See *Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) ("[W]e defer to the [state court's] decision unless we conclude that its result--not its rationale--is legally or factually unreasonable.") (internal citation and quotation omitted).

A state court decision is "contrary to" clearly established federal law for purposes of § 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the result reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be "diametrically different," "opposite in character or nature," or "mutually opposed" to the Supreme Court decision itself. *Id.* at 406.

A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "AEDPA's conception of objective unreasonableness lies 'somewhere between clearly erroneous and unreasonable to all reasonable jurists.'" *House v. Hatch*, 527 F.3d 1010, 1019 (10th Cir. 2008) (*quoting Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)). "Thus, 'only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254.'" *Id.* (*quoting Maynard* at 671).

In conducting this inquiry, the factual findings of the state trial and appellate courts are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *See Short v. Sirmons*, 472 F.3d 1177, 1184 (10th Cir. 2006) (*citing* 28 U.S.C. § 2254(e)(1)).

## III. ANALYSIS

### A. Whether the Video Taped Confession was Obtained Involuntarily in Violation of Petitioner's Fifth and Fourteenth Amendment Rights

Petitioner contends that his taped confession was coerced. According to Petitioner, Detective Miller outlined the evidence the police had gathered against Petitioner and told Petitioner that if he were to tell the truth, he, Detective Miller, could go to the prosecutor and tell him that Petitioner had shown genuine remorse. Otherwise, Detective Miller stated the he would put together the best case he could with the evidence he had already gathered and tell the prosecutor that Petitioner had shown no remorse. Detective Miller then stated that the prosecutor was very fair when suspects cooperated with the police (Petitioner's Brief at 5-7). At the trial, Detective Miller testified that he did, in fact, tell the district attorney that Petitioner had cooperated with the investigation (TR. 423).

This issue was raised for the first time in Petitioner's appeal, and the OCCA reviewed the issue for plain error (OCCA Opinion at 2). The OCCA determined that the admission of the taped confession was not coerced:

> As to Proposition 1, because [Petitioner] did not challenge the voluntariness of his custodial statements to police before trial, we review admission of those statements for plain error. *Van White v. State*, 1999 OK CR 10, ¶ 44, 990 P.2d 253, 267. The officers' exhortations for [Petitioner] to tell the truth were not

7

> accompanied by any promise of a specific result; hence the statements, made after full *Miranda* warnings, were not coerced. *Young v. State*, 1983 OK CR 126, ¶ 15, 670 P.2d 591, 595. Furthermore, [Petitioner] cannot show any prejudice from introduction of his custodial statements, because they were largely consistent with his testimony at trial that he acted in self-defense. *Chapman v. California*, 386 U.S. 18 (1967); *Harmon v. State*, 2011 OK CR 6, ¶32 ___P.3d ___. There was no plain error here.

(OCCA Opinion at 2).

The voluntariness of a confession is a question of law subject to *de novo* review. *United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009). *See also Miller v. Fenton*, 474 U.S. 104, 112 (1985) (an unbroken line of Supreme Court cases brought both on direct appeal and on review of applications to lower federal courts for a writ of habeas corpus, dictate that the voluntariness of a confession merits independent federal consideration). A state court's subsidiary factual questions are, however, entitled to the presumption of correctness. *Id.*

A determination that a confession was voluntarily rendered is based on the totality of the circumstances, including: (1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment. The court must examine the entire record and make an independent determination of the ultimate issue of voluntariness. A confession is involuntary only when the police use coercive activity to

undermine the suspect's ability to exercise his free will. *Williams*, at 1162 (internal citations omitted).

This Court's review of Exhibit 27 and the underlying facts leaves this Court with no doubt as to the voluntariness of Petitioner's statement to the detectives. Petitioner was eighteen years old, had a GED high school diploma, and was gainfully employed (TR. 429). His demeanor throughout the interview indicated that he understood the questions posed to him and made no objections to answering the questions. Exhibit 27 depicts the detectives explaining Petitioner's rights to him, and shows Petitioner signing a document, introduced as Exhibit 26, stating that he understood and waived his rights, and then he voluntarily gave his statement to the detectives. The detectives made no statements that could be construed as a promise of leniency. Moreover, the detectives made no threats of violence. Although Petitioner was clearly in custody, he was not restrained with handcuffs or otherwise. The statement was taken around 8:00 p.m. on the same day Petitioner was arrested, and the interrogation lasted less than an hour. In all relevant respects, Petitioner's statement was consistent with his testimony at trial. The major difference was Petitioner's statement to the detectives that he had thrown the gun in the river. Petitioner apparently made this statement in an effort to protect Hallman. He later told the detectives he had left the gun in a hotel in Anadarko where the detectives found the gun (TR. 415). Considering the totality of the circumstances, this Court concludes that Petitioner's statement was voluntary.

## B. Whether the Trial Court's Jury Instructions Violated Petitioner's Sixth and Fourteenth Amendment Rights

Petitioner contends that the trial court issued confusing jury instructions regarding the lesser included offense of First Degree Manslaughter. This issue, too, was first raised on direct appeal, and the OCCA reviewed the issue for plain error.

The Supreme Court has stated that, with respect to alleged errors in jury instructions, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). A habeas proceedings "may not be used to set aside a state conviction on the basis of erroneous jury instructions unless the error had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense" *Shafer v. Stratton*, 906 F.2d 506, 508 (10th Cir. 1990) (internal quotation and citations omitted). "In a habeas proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden." *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) (citations omitted).

Petitioner acknowledges that the trial court properly instructed the jury on the consideration of the lesser included offense of first degree manslaughter pursuant to the Oklahoma Uniform Jury Instructions (OUJI) No. 10-24 (Trial Instruction No. 22A). *See* Instructions to Jury Panel, Case No. CF-2009-172 (Instructions) at 176. Petitioner challenges only the trial court's inclusion of OUJI 10-13 (Trial Instruction No. 38) (Instructions at 193). The latter instruction is a basic instruction regarding the return of a verdict. The OCCA acknowledged that Trial Instruction 38 was unnecessary (OCCA Opinion

10

at 3 n. 2). The OCCA found, however, that the basic instruction was also given in regard to the lesser included offense of manslaughter in the first degree (Trial Instruction No. 40). The OCCA concluded that, considered as a whole, the jury instructions did not suggest, as Petitioner claims, that consideration of the manslaughter option first required a full acquittal of the first degree murder charge. The jury instructions as a whole are proper, and the OCCA's opinion regarding this issue is neither contrary to, nor an unreasonable application of, Supreme Court law. Petitioner is not entitled to habeas relief on this ground.

### C. Whether the Trial Court Violated Petitioner's First and Fourteenth Amendment Rights by Allowing Introduction Of Expert Witness Testimony about the Customs and Culture of Street Gangs

Petitioner contends that the testimony of Timothy Poff, a Lawton police officer working with the department's gang unit, was cumulative, irrelevant and prejudicial (Petitioner's Brief at 13-18). Over defense counsel's objection, Poff testified that he had undergone special training related to his assignment to the gang unit (TR. 366). Poff was among the officers who ultimately arrested Petitioner, and he testified as to the circumstance surrounding Petitioner's arrest (TR. 369). Poff testified that "What's up cuz" is "a common term used by Crips to either greet someone of their own gang or disrespect someone who's not in their gang" (TR. 370). He testified that a "burner" is a gun and that to be "strapped" means a person is carrying a gun (TR. 371). The OCCA considered whether the trial court abused its discretion in admitting the testimony in question and determined that it had not:

> As to Proposition 3, because trial counsel timely objected to the testimony complained of here, we consider whether the

> court abused its discretion in admitting it. *Hancock v. State*, 2007 OK CR 9, ¶ 72, 155 P.3d 796, 813. In fact, the court sustained counsel's objection in part, admonishing the prosecutor to keep the expert testimony regarding "gang culture" as brief and relevant as possible. The Witness answered approximately a half-dozen questions, primarily defining slang terms used by the witnesses and by Appellant himself. The court did not abuse its discretion here

(OCCA Opinion at 3).

As with other state law issues on habeas review, this Court can review state court evidentiary rulings only "to determine whether the error was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Hooker v. Mullin*, 293 F.3d 1232, 1238 (10th Cir. 2002) (internal quotations and citations omitted). Poff's testimony regarding gang culture was limited primarily to defining gang terms that were also defined by other witnesses. The trial court's admission of Poff's testimony does not rise to the level of a constitutional violation.

### D. Whether the Trial Court Committed Fundamental Error by Including Jury Instructions on the Issue of the Identity of the Initial Aggressor

A challenge to jury instructions is a matter of state law, and, as discussed *supra* at 9-10, a habeas petitioner cannot obtain habeas relief on such a challenge unless the trial was rendered fundamentally unfair by the challenged jury instructions. In this ground for habeas relief, Petitioner contends that the jury instructions regarding self-defense and the identity of the first aggressor denied him of his theory of self-defense (Petitioner's Brief at 20).The instructions in question are OUJI-CR 8-45, 8-46, 8-47, 8-49, 8-50, 8-51, 8-52, 8-53 and 8-56 ( Instructions at 185-192). The OCCA found that the conflicting trial testimony

created an issue regarding who was the initial aggressor in this case and that the trial court did "not plainly err in giving the full complement of Uniform Instructions on the law of self-defense" (OCCA Opinion at 3). Citing Oklahoma case law, the OCCA held that not giving the instructions would have meant that "the trial court had improperly assumed that the defendant was the aggressor" (OCCA Opinion at 4). *See Keith v. State*, 1985 OK CR 150 ¶ 17, 709 P.2d 1066, 1070. The OCCA's disposition of this ground for relief is not contrary to, nor an unreasonable application of Supreme Court law, and the instructions in question did not render Petitioner's trial fundamentally unfair.

E. **Whether the Introduction of Crime Scene Photographs Deprived Petitioner of a Fair Trial**

Petitioner challenges the introduction of crime scene photographs, including photographs of the victim taken after the shooting (Petitioner's Brief at 24-27). The admissibility of evidence is a matter of state law. In a federal habeas proceeding wherein the petitioner challenges the trial court's introduction of evidence, this Court will not question "evidentiary or procedural rulings of the state court unless [the petitioner] can show that, because of the court's actions, his trial, as a whole, was rendered fundamentally unfair" *Maes v. Thomas*, 46 F. 3rd at 987 (internal quotation and citation omitted).

In this case, the OCCA reviewed Petitioner's assignment of error and determined that the photographs were relevant and properly admitted under state law:

> The photographs of the crime scene were relevant to corroborate the testimony of the witnesses to the crime, as well as the Medical Examiner's conclusions. There is nothing particularly gruesome or distracting about them

13

(OCCA Opinion at 4).

The OCCA's opinion regarding the introduction of crime scene photographs is neither contrary to, nor an unreasonable application of Supreme Court law. Because Petitioner cannot demonstrate that the introduction of the crime scene photographs rendered his trial fundamentally unfair, habeas relief should not be granted on this ground.

**F. Whether Petitioner was Denied a Fair Trial when the Prosecutor was Allowed to Argue Facts Not in Evidence during Closing Arguments**

Petitioner contends that prosecutorial misconduct deprived him of a fair trial. The Supreme Court has held that prosecutorial misconduct may "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (internal quotation and citation omitted).

Where, as here, the conduct complained of does not affect a specific right, "[h]abeas relief is available for prosecutorial misconduct only when the misconduct is so egregious that it renders the entire trial fundamentally unfair." *Cummings v. Evans*, 161 F.3d 610, 618 (10th Cir. 1998) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 642-648 (1974)).

In this case, Petitioner objects to the following statement by the prosecutor in his closing argument:

> Now, there's testimony from the Defendant that he thought that Timms had a gun or was pulling a gun, but he says he never actually saw the gun

(TR. 472). At trial, Petitioner's testimony as to whether Timms' had a gun was equivocal:

14

> A. Then that's when Justin Timms kind of started walking in a diagonal to the street. Like -- he was like in front of me and he kind of started walking like this. As he was walking, he started to turn around. And with his left hand, I see him start to reach what appeared to be a firearm to me.
>
> Q. Did it look like a gun to you?
>
> A. It did. It was chrome, silverish looking.
>
> Q. And did you -- did he pull it all the way out or did you even --
>
> A. I can't say he pulled it all the way out, but I could tell by his hand movement that showed me he was coming with what appeared to me to be a firearm at the time.

(TR. 437).

The OCCA determined that this single statement of the prosecutor "was not an unfair description of the testimony" (OCCA Opinion at 4). This Court agrees. Accordingly, the OCCA's decision regarding alleged prosecutorial misconduct is neither contrary to, nor an unreasonable application of Supreme Court law.

### G. Whether Petitioner was Deprived of his Right to Effective Assistance of Counsel

Petitioner contends that trial counsel was ineffective in that he failed to object to introduction of the confession, to improperly admitted evidence, to erroneous jury instructions, and to the statements by the prosecutor during closing argument (Petitioner's Brief at 29-34).

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984) provides the standard for evaluating Petitioner's claims of ineffective assistance of counsel.

Under *Strickland*, counsel's assistance is constitutionally deficient if it fell below an objective standard of reasonableness and counsel's errors prejudiced the defense. *Id.* at 687. Judicial review of an attorney's assistance is "highly deferential," and courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. The reasonableness of the challenged conduct is evaluated from counsel's perspective at the time of the alleged error. *Id.* Prejudice, under the second prong, is shown by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

In this case, Petitioner cannot demonstrate that he was prejudiced by his counsel's representation. Counsel did not challenge the voluntariness of Petitioner's confession because there was no basis for such an objection. He did not object to the jury instructions, but the jury instructions, read as a whole, properly stated the law. Counsel also failed to object to the prosecutor's closing argument, but Petitioner cannot demonstrate that he was prejudiced by this alleged error. None of the grounds for habeas relief that Petitioner raises constitutes harmful error. Petitioner is not entitled to habeas relief on this issue.

### H. Whether Cumulative Error Deprived Petitioner of a Fair Trial

In reviewing a claim of cumulative error, a court may consider only actual errors for purposes of determining whether a due process violation has occurred. *See Le v. Mullin*, 311 F.3d 1002, 1022-1023 (10th Cir. 2002) ("When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated.") (internal citations and quotations omitted). Having found no errors, the OCCA determined that Petitioner could not demonstrate that cumulative error deprived him of a fair trial. This Court, too, has reviewed the claims raised in the other grounds for habeas relief and has not found any errors, much less multiple errors, that could result in cumulative error. Therefore, this claim is without merit.

### RECOMMENDATION

It is recommended that the Petition for Writ of Habeas Corpus, **ECF No. 1**, be **DENIED**.

### NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636. Any objections must be filed with the Clerk of the District Court by **September 30, 2013**. *See* Local Civil Rule 72.1. Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

**STATUS OF REFERRAL**

This Report and Recommendation **disposes of all matters** referred by the District Judge in this case and **terminates the referral.**

**ENTERED** on September 12, 2013.

_/s/ Shon T. Erwin_
SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE